JOYCE BERRYHILL and
CARTINA BERRYHILL,

    Plaintiffs/Appellants,

VS.

RON G. SWINEA and wife,
WILLIE JO SWINEA,

    Defendants/Appellees/Third-
    Party Plaintiffs/Appellants,

WILLIAM TUCKER; RANDY TUCKER
and wife, DONNA E. TUCKER;
CLELAND EZELL and wife,
SHIRLEY EZELL,

    Defendants/Appellees/Third-
    Party Plaintiffs,

MARGIE L. NEWTON,

    Third-Party Defendant.

**FILED**

**October 22, 1997**

**Cecil W. Crowson
Appellate Court Clerk**

Appeal No.
01-A-01-9702-CH-00082

Lawrence Chancery
No. 6243-93

COURT OF APPEALS OF TENNESSEE
MIDDLE SECTION AT NASHVILLE


APPEALED FROM THE CHANCERY COURT OF LAWRENCE COUNTY
AT LAWRENCEBURG, TENNESSEE

THE HONORABLE JAMES L. WEATHERFORD, JUDGE


RANDY HILLHOUSE
327 West Gaines Street
P. O. Box 787
Lawrenceburg, Tennessee 38464
    Attorney for Plaintiffs/Appellants

CHARLES W. HOLT, JR.
P. O. Box 357
Lawrenceburg, Tennessee 38464
    Attorney for Defendants/Appellees

PAUL PLANT
P. O. Box 399
Lawrenceburg, Tennessee 38464
    Attorney for Defendant


REVERSED AND REMANDED


BEN H. CANTRELL, JUDGE

CONCUR:
TODD, P.J., M.S.
KOCH, J.

# O P I N I O N

The parties to this boundary line dispute all acknowledged that the deeds to their respective properties described their common boundary as a straight line, but they differed as to the correct placement of that line. After hearing all the proof, the trial court ordered a new survey to establish a boundary line whose bearings changed in mid-course, giving each of the parties some of what they claimed. We reverse the order of the trial court, because we can find no evidence in the record to support it.

## I. The Origins of the Dispute

All the properties in dispute are derived from a tract of Lawrence County land totaling 253 acres, which had been owned by Mr. W.T. Baker. In 1945, Mr. Baker conveyed the southern 113 acres of this combined property to his son, Calvin Baker. The northern boundary of the property conveyed away was described as running from a point on the railroad in a straight line north 76° west 214 poles to the western boundary. Through a series of transactions, including a 1961 sale to Waymon Berryhill and Billy G. Mabry, this property eventually devolved to the plaintiffs, Joyce Berryhill and her daughter, Cartina Berryhill.

In 1965, Mr. Baker sold his remaining property, in a deed which described it as "consisting of 140 acres, more or less." The southern boundary line of this property contained essentially the same description as the northern line of the property previously conveyed to Calvin Baker. The real estate passed through several hands before becoming the property of Marjorie Lynch Newton and her husband in 1972. The Newtons built a house and established a peach and apple orchard on the property.

The Newtons divorced, and in 1990 Mr. Newton quitclaimed his interest in the property to his former wife. In 1992, Ms. Newton divided the land into eight tracts, which were sold at auction. The defendants in this case are the purchasers of four tracts which adjoin the Berryhill property.

The parties agree on the beginning point at the railroad. An old fence begins at that point and extends about 2000 feet north-westward in a straight line before turning almost due south. The Newtons had built a driveway that extended about 800 feet along the northern side of that fence. The Berryhills contend that the line follows that fence, and continues in a straight line from where the fence turns, and they produced evidence that the line is marked by a series of blazes on a line of old trees.

The defendants (or their predecessor, Ms. Newton) had installed a single strand barbed wire fence, beginning at the agreed upon point on the railroad, but following a more southerly angle, and they claimed all the land north of this new fence. The Berryhills subsequently sued to establish the correct boundary line.

At trial the defendants argued that the true property line was an even older fence (no longer in existence) that had enclosed a cattle lane used by W.T. Baker. Though they were able to produce photographs at trial of pieces of an old style of web wire fencing that could be found along the edge of the old cattle lane, they did not produce any evidence that the fence in question corresponded to any of the descriptions in the deeds. Instead, they relied upon a survey of the property that had been commissioned by Ms. Newton after the sale of her property. The defendants also filed a third party claim against Ms. Newton, for breach of warranty of title, in the event that the Berryhills prevailed on their claim.

After hearing testimony from the parties, their neighbors and two surveyors, the trial court ordered that an independent surveyor be appointed to establish a a new boundary line,

> "BEGINNING at a point immediately adjacent to the drive and following the fence immediately adjacent to the drive to a point where the fence turns in a southerly direction; thence from that point in a straight line to a point 217 feet south of the northwest corner of the Berryhill property as shown on the survey of J.T.Dixon."

The boundary line established by the court's order ran from the railroad with the old fence to the point where it turned south; then the line ran at a different angle to a point 217 feet south of the point where the extension of the old fence line intersected the western edge of the property. The plaintiffs appealled, as did the defendants Ron G. Swinea and his wife, Willie Jo Swinea.

## II. The Cleghorn Survey

We can find no evidence in the record to support the boundary ordered by the trial court. The parties insist that all their deeds indicate a straight line boundary. The surveys relied upon by both parties agree as to the starting point of that boundary. They only disagree as to its proper bearing.

Perhaps the most revealing testimony in this case was that of Mr. Eddie Cleghorn, who surveyed the Newton property. Mr. Cleghorn first assumed that the fence line would be the boundary. But when he ran the fence line out, he discovered that the acreage of the Newton property would come up short of the amount called for in the original deed from Mr. Baker. He then had a discussion with the auctioneer, John Marion "Skeets" Eskridge, from which he understood that Mr. Eskridge had gotten permission from the Berryhills to run the line further south.

Mr. Cleghorn subsequently drafted a survey which indicated a southern boundary for the Newton property with a bearing of North 74 degrees 06' 03" West. The deeds Ms. Newton issued to the defendants all recited this bearing. However, all the deeds in both the Newton's and the Berryhill's chains of title recited a bearing of North 76 degrees 0' 0" West. Joyce Berryhill testified that she never agreed that the line belonged where Mr. Cleghorn attempted to place it.

On direct, Mr. Cleghorn testified as follows:

Q. Would you have issued your survey, if you had some other understanding or agreement?

A. No, sir.

Q. Why not?

A. It just wouldn't be good business practice.

His testimony on this point was further clarified under cross-examination:

Q. Did I understand you, that you would not have marked this as the south boundary line unless you had understood that my clients agreed to it?

A. Right.

Q. The reason for that is there's just nothing to indicate that this is the south boundary line?

A. Right.

### III. The Dixon Survey

After they became aware of the Cleghorn survey of the Newton property, the plaintiffs hired another licensed surveyor, Mr. J.T. Dixon, to survey their own land. Mr. Dixon found that the fence row had a true north bearing of North 76 degrees 0'0" West. He testified that he and his crew found old hacks and blazes along the same

line after the fence turned, all the way to the western boundary of the Berryhill property.

Mr. Dixon also checked on the records of the adjoining properties, going back to Mr. Baker, and discovered a 1963 land line agreement between Mr. Baker and Mr. Meiers, who owned the property to the north and west of Mr. Baker's tract. He testified that in straightening the line between their respective properties, the agreement had taken about eighteen acres off the north side of the Baker farm, and he suggested that this accounted for the shortfall in acreage on the Newton property that Mr. Cleghorn discovered. Interestingly, the boundary he drew gave the Berryhills about 114 acres, only slightly more than had been granted by W.T. Baker in the 1945 deed to his son.

On cross-examination, the defendants' attorney managed to bring out some discrepancies between the calls in the deed and the boundaries described in the survey. In particular, the northern boundary line was 160 feet longer in the survey than was called for in the deed (4,191 feet). Mr. Dixon admitted that the bearing of the line would have to be turned sharply to the south in order for it to close at the distance called for in the deed.

Neither the judge's order nor his statements at trial indicate how he arrived at the decision to order another survey to establish a new boundary. Apparently he found credible evidence on both sides, and we are tempted to speculate that he found Mr. Dixon's testimony as to the correct bearing of the boundary to be persuasive, but was disturbed by the contradictory testimony as to blazes and marks on the trees west of the fence line. Several witnesses, including Mr. Cleghorn and Mr. Eskridge, testified that they could not find any such marks.

In any case, it is clear that the trial court did not find the survey drawn by Mr. Cleghorn to accurately reflect the boundaries called for in the deeds, as the line he ordered drawn nowhere follows that survey.

## IV. The Role of the Chancellor

Though the chancery court has jurisdiction to determine a boundary line, Tenn. Code Ann. § 16-11-106, it is the duty of the chancellor to uphold the boundaries described in the deed, if at all possible. If the description found in the deed is so inconsistent that some its calls must be rejected, then there is an established order of precedence to be followed between different calls, subject only to the consideration that the controlling call should be the one most consistent with the intention of the grantor.

This order of precedence is described as follows in *City of Johnson City v. State,* 202 Tenn. 318, 304 S.W.2d 317 (1957), quoting 16 AmJur § 262:

> "In the event that two or more of the descriptive elements used conflict with or are inconsistent with the others, resort is first to be had to natural objects or landmarks, next to artificial marks, then to adjacent boundaries, and then to courses and distances, unless it appears that mistakes exist in respect to the calls, in which event an inferior means of location may control a higher one. That rule should be adopted which is most consistent with the intent of the grant."

202 Tenn. at 323, 304 S.W.2d at 320.

Monuments and landmarks do not figure prominently in the present case, except for the 2000 foot fence, which is not mentioned in the deeds of either party. The deeds indicate a straight line boundary with a bearing of North 76 degrees 0' 0" West between the portion of the property Mr. Baker conveyed to his son, and the portion he retained. The fence line adopted as the boundary by Mr. Dixon had the correct bearing. Neither the line defined by the Cleghorn survey nor the one ordered by the judge followed the deed.

The consistency between the amount of acreage conveyed to the Berryhills' predecessor and the amount enclosed by the Dixon survey is another argument for that survey's accuracy. The discrepancy first discovered by Mr. Cleghorn between the acreage recited in the Newton deed and the acreage north of the Berryhills' fence line can be explained by the 1963 boundary line settlement between Mr. Baker and his neighbor to the north.

The discrepancy between the length of the northern boundary called for in the Berryhills' deed, and its length as measured in the Dixon survey amounts to between 3% and 4% of the deed amount. The proof showed that the eastern one-third of the property was relatively level and was mostly cleared fields, while the western portion was wooded and hilly. A discrepancy of this magnitude is not surprising, given the difficulties inherent in measurement over uneven ground. In any case, we would find it hard to believe that the original grantor intended for the length of this line to control over its bearing, when that bearing is measured from, and determines the boundary of, the more productive portion of the property.

For all these reasons, we find that the correct boundary line may be determined with reference to the Dixon survey, and we reverse the trial court.

## V. The Third Party Complaint

The Court granted the motion to dismiss the third party complaint against Margie L. Newton, stating

> "The Court finds the motion to be well taken, it being the opinion of the court that the sale was in gross and not by the acre; and there being no evidence nor allegation of any misrepresentation or fraud of any kind on behalf of the Third-Party Defendant or her agents, that the Third-Party Complaint would not lie."

The court apparently concluded that the defendants knew what they were bargaining for, and that since they received it, they should not be heard to complain if upon survey the acreage was less than they believed it to be.

The deeds to the four defendants set out the boundaries of the land conveyed, and nowhere do they state the acreage involved. The price is a recited as a lump sum rather than a per acre price. It thus appears that the trial court was correct in characterizing the sale as one in gross rather than by the acreage.

However, the defendants/third-party plaintiffs argue that their claim against Ms. Newton rests upon an entirely different footing, and we agree. The warranty deeds she issued all recite a southern boundary with a bearing of North 74 degrees 06' 03" West. The deeds further go on to state, in fairly standard language:

> ". . . I am lawfully seized and possessed of said land in Fee Simple, have a good right to convey it, and the same is unincumbered.
> And I do further covenant and bind myself, my heirs and representatives, to warrant and forever defend the title to said land to the said [names of defendants], their heirs and assigns, against the lawful claims of all persons whomever.

The defendants contend that the action of the trial court had the effect of evicting them from a portion of the land granted to them in the deed, thus creating a cause of action for breach of warranty. They further claim that if it should be found that they have not been evicted, then they still have a claim against Ms. Newton for breach of covenant of seisen.

Black's Law Dictionary (Fourth Ed. 1951) defines covenant of warranty as "[a]n assurance by the grantor of an estate that the grantee shall enjoy the same without interruption by virtue of paramount title." Covenant of seisin is defined as "[a]n assurance to the purchaser that the grantor has the very estate in quantity and quality which he purports to convey."

This court has stated in much the same language that:

> "We recognize that it is established law that if the purchaser has not been evicted, in the absence of fraud or insolvency, he can have no remedy for a breach of warranty. (Citations omitted).
>
> "However, the rule is different as to a covenant of seisin. A covenant of seisen is an assurance to the purchaser that the seller has the very estate, in quantity and quality, which the deed purports to convey, it is a personal covenant preaesenti,and, if not true, is breached the instant it is made, and an immediate course of action accrues to the vendee for its breach without and before eviction." (Citations omitted).

*Thompson v. Thomas*, 499 S.W.2d 901, 903 (Tenn. App. 1973).

In view of the fact that Ms. Newton conveyed to the defendants property that she had did not have the right to dispose of, it appears that the defendants have at the very least a cause of action against her for breach of the covenant of seisin, and that the trial court erred in dismissing their third party complaint. It also appears that the court is obliged to exercise its equitable powers to reform the defendants' deeds.

## VI.

The order of the trial court is reversed. Remand this cause to the Chancery Court of Lawrence County for further proceedings consistent with this opinion. Tax the costs on appeal to the appellees.

_____
BEN H. CANTRELL, JUDGE

CONCUR:

_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION

- 11 -

_____
WILLIAM C. KOCH, JR., JUDGE